DECISION AND JUDGMENT ENTRY
{¶ 1} Sheri Thibodeaux appeals the Ross County Common Pleas Court's decision granting summary judgment to B E K Construction on her claims for constructive discharge, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. Thibodeaux contends the trial court erred in concluding, as a matter of law, that B E K did not constructively discharge her. However, no reasonable trier of fact could find that a reasonable person in Thibodeaux's shoes would have felt compelled to resign. Thus, the court properly granted summary judgment on the constructive discharge claim. Additionally, in order to establish a claim for wrongful discharge in violation of public policy, Thibodeaux must show that B E K discharged or disciplined her in violation of public policy. Because Thibodeaux failed to establish that B E K actually or constructively discharged her, summary judgment on this claim was appropriate. Finally, Thibodeaux contends the court erred in granting summary judgment on her claim for intentional infliction of emotional distress. Specifically, she argues that the court erred in finding that she failed to establish any severe and debilitating emotional anguish. However, Thibodeaux's own statements establish that she did not suffer emotional distress of the magnitude necessary to sustain a cause of action for intentional infliction of emotional distress. That is, no reasonable trier of fact could find that Thibodeaux suffered serious emotional distress. Thus, the trial court properly granted summary judgment on her claim. Accordingly, we affirm the trial court's judgment.
 {¶ 2} B E K Construction Company is located in Birmingham, Alabama. B E K rebuilds, remodels, and repairs factories across the country. At each factory, B E K establishes a construction site and hires hourly employees to work at the site. At any given time, B E K employs about 2,000 to 3,000 hourly employees in its construction division.
 {¶ 3} In 1997, Sheri Thibodeaux was running a feed store in Marietta, Texas. Gene Smith, an employee of B E K, was a regular customer at the store. In June 1997, Smith offered Thibodeaux a job working for B E K at a construction site in Valliant, Oklahoma. Thibodeaux accepted Smith's offer, and four months later, she began working as an emergency medical technician in the safety department. At the time, Smith was the safety coordinator for the Valliant site.
 {¶ 4} According to Thibodeaux, Smith behaved inappropriately towards her from day one. Thibodeaux testified that Smith frequently propositioned her for sex and told her that she could advance with the company if she had sex with him. In addition, she testified that Smith grabbed her breasts and crotch. On one occasion, when Smith and Thibodeaux were at a paper mill, Smith showed Thibodeaux where the workers cut the paper and told her that he "wished [she was] naked and tied down so that the big knife could cut [her] in two." On another occasion, Smith fashioned a voodoo doll out of yarn. He then chased Thibodeaux around the safety trailer, held her down, and cut her hair. After attaching the hair to the voodoo doll, Smith stuck pins in the doll's breasts and crotch and hung the doll in the safety trailer. Smith told a number of people that the voodoo doll represented Thibodeaux.
 {¶ 5} In November 1997, B E K laid Thibodeaux off as part of a reduction in force. Thibodeaux returned to Texas and continued to run her feed store. In April 1998, Thibodeaux accepted a job working for B E K at a construction site in Hopewell, Virginia. There, Thibodeaux worked as a safety technician and helped the personnel manager, Nancy Fisher, with new-employee orientation.
 {¶ 6} After a week in Hopewell, Thibodeaux transferred to a construction site in Chillicothe, Ohio. As in Hopewell, Thibodeaux worked as a safety technician and helped Nancy Fisher with new-employee orientation. The Chillicothe job was a large one, and B E K hired new employees every day. The company established a personnel office six miles from the construction site. Thibodeaux spent her mornings in the personnel trailer and her afternoons in the safety trailer. Gene Smith was the safety coordinator for the Chillicothe site.
 {¶ 7} In Chillicothe, Smith's behavior worsened. Thibodeaux testified that Smith frequently propositioned her for sex and told her that he would have her, even if he had to rape her. In addition, Smith told Thibodeaux that if she wanted to grow with B E K, she would have to sleep with him and his girlfriend. In the safety trailer, Smith would often show Thibodeaux images of bestiality and necrophilia that he stored on his computer. Once, Smith showed Thibodeaux a photograph of his girlfriend performing oral sex on him. Thibodeaux testified that Smith attempted to grab or touch her on a daily basis.
 {¶ 8} The situation further deteriorated when Gene Smith's friends, Cliff Thompson and Ken Didway, began to join in the harassment. Thibodeaux testified that Cliff Thompson, a pipe superintendent with B E K, exposed himself to her twice. In addition, Thibodeaux testified that Thompson propositioned her for sex. According to Thibodeaux, Thompson offered to give her $500 and a gold bracelet if she would have sex with him. On one occasion, Gene Smith and Ken Didway forced Thibodeaux's head into Didway's crotch while Thibodeaux cried and screamed.
 {¶ 9} In late May, Thibodeaux told Nancy Fisher about Cliff Thompson exposing himself to her. Fisher subsequently contacted her supervisor, William Harris, and asked him how to handle a problem between an hourly employee and some salaried employees.[1] Harris informed Fisher that Randy Evans, the construction manager, would be in Chillicothe later that day. He suggested that she talk to Evans about the problem. Later that evening, Fisher informed Evans that Thompson had exposed himself to Thibodeaux. Evans stated that he would talk to Carolyn Morgan, Vice President of Human Resources, about the problem. The next day, Evans asked Morgan to go to Chillicothe and investigate the incident.
 {¶ 10} Carolyn Morgan arrived at the Chillicothe site on May 26, 1998. Over the next two days, Morgan interviewed employees at the site. At first, Morgan's investigation focused solely on the incident involving Cliff Thompson. As the interviews progressed, however, her investigation expanded to include allegations against Gene Smith. During the first day of the investigation, Morgan spoke with Thibodeaux. According to Morgan, Thibodeaux initially refused to provide any information about Thompson or Smith. Thibodeaux stated that she didn't know anything and that she needed her job. Morgan testified that Thibodeaux seemed upset and nervous. Therefore, Morgan encouraged Thibodeaux to come back and talk to her later. Thibodeaux returned the next day. At that time, Thibodeaux told Morgan everything that had happened with Thompson and Smith. She also told Morgan about Ken Didway's involvement in the harassment. However, Morgan was unable to confirm Thibodeaux's allegations against Didway.
 {¶ 11} As a result of her investigation, Carolyn Morgan concluded that the situation involving Gene Smith required immediate action. Therefore, she had Smith removed from the job site. Shortly afterward, B E K permitted Smith to resign from his employment. B E K also removed Cliff Thompson from the job site following the investigation. As for Ken Didway, Morgan recommended that B E K replace him as soon as it could "get someone in to the job". However, Richard Baldwin, the corporate safety director, testified that he decided to "leave [Didway] in place". Later, after additional information surfaced about Didway's behavior, B E K determined that he would not be eligible for rehire.
 {¶ 12} According to Thibodeaux, Gene Smith's replacement did not arrive in Chillicothe until three days after Smith's removal. She testified that B E K made Ken Didway her temporary supervisor in Smith's absence. B E K disputes this version of events. Nancy Fisher testified that Bob Fitzgerald arrived in Chillicothe the same day that Smith left. In addition, Richard Baldwin testified that he sent Bob Fitzgerald to Chillicothe immediately after Smith's removal. He testified that while Didway continued to work with Thibodeaux, he was not her supervisor. Carolyn Morgan also testified that while Didway was the most senior person in the safety department after Smith's removal, he was not Thibodeaux's supervisor.
 {¶ 13} In early June, Thibodeaux missed several days of work due to illness. On the day Thibodeaux finally returned to work, she arrived late. Thibodeaux testified that when she arrived, Bob Fitzgerald told her to gather up her personal belongings and report to personnel. Believing that she was about to be fired, Thibodeaux decided to quit. Thus, she reported to personnel and informed Nancy Fisher that she was quitting. According to Fisher, Thibodeaux stated that she was "not going to let [B E K] fire [her]". Fisher assured Thibodeaux that Fitzgerald did not intend to fire her, just talk to her. Fisher testified that she pleaded with Thibodeaux not to quit. Despite Fisher's pleas, Thibodeaux quit her job with B E K. Later, B E K hired Thibodeaux for two additional jobs. In July 1998, Thibodeaux worked for B E K at a construction site in Decatur, Alabama. From October 1998 to February 1999, she worked for B E K at a construction site in Summerville, South Carolina.
 {¶ 14} In April 2000, Thibodeaux filed a complaint against B E K alleging statutory and common law sexual harassment, constructive discharge, unlawful retaliation, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. In May 2003, B E K filed a motion for summary judgment. The company supported its motion with deposition testimony from Richard Baldwin, William Harris, Carolyn Morgan, Nancy Fisher, and Thibodeaux. Thibodeaux filed a memorandum in opposition, which she supported with deposition testimony and an affidavit. In January 2004, the trial court denied summary judgment on Thibodeaux's sexual harassment claims. However, the court granted summary judgment to B E K on Thibodeaux's claims for constructive discharge, unlawful retaliation, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. In doing so, the trial court concluded that there was "no just cause for delay." Thibodeaux now appeals the court's decision and raises the following assignments of error: "ASSIGNMENT OF ERROR NO. 1
— The trial court erred in failing to properly accord weight to testimony of witnesses setting forth that one of appellant's harassers was to become her supervisor. ASSIGNMENT OF ERROR NO.2 — The trial court erred in granting summary judgment denying appellant's claim that she was constructively discharged.ASSIGNMENT OF ERROR NO. 3 — The trial court erred in granting summary judgment denying Ms. Thibodeaux's claim for wrongful discharge in violation of public policy. ASSIGNMENT OF ERROR NO.4 — The trial court erred in granting summary judgment denying Ms. Thibodeaux's claim that she suffered intentional infliction of emotional distress by appellee."
 {¶ 15} In reviewing a summary judgment, the lower court and appellate court utilize the same standard, i.e., we review the judgment independently and without deference to the trial court's determination. Midwest Specialties, Inc. v. Firestone Tire Rubber Co. (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411. Summary judgment is appropriate when the following have been established: (1) that there is no genuine issue of material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence against it construed most strongly in its favor. Bosticv. Connor (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, citingHarless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,66, 375 N.E.2d 46. See, also, State ex rel. Coulverson v. OhioAdult Parole Auth. (1991), 62 Ohio St.3d 12, 14, 577 N.E.2d 352; Civ.R. 56(C). The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting summary judgment. Mitseff v. Wheeler (1988), 38 Ohio St.3d 112,115, 526 N.E.2d 798. If the moving party satisfies this burden, "the nonmoving party then has a reciprocal burden under Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial, and if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Vahila v. Hall, 77 Ohio St.3d 421, 429,1997-Ohio-259, 674 N.E.2d 1164, quoting Dresher v. Burt (1996),75 Ohio St.3d 280, 295, 662 N.E.2d 264.
 {¶ 16} Because they are related, we will address Thibodeaux's first and second assignments of error together. However, we must first address a jurisdictional issue.
 {¶ 17} In part of her second assignment of error, Thibodeaux contends the court erred in concluding that B E K could avail itself of the affirmative defense established in Faragher v.Boca Raton (1998), 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662
and Burlington Industries, Inc. v. Ellerth (1998),524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633. However, the trial court's ruling on this issue relates to Thibodeaux's sexual harassment claims. As noted, the trial court denied summary judgment on those claims. Generally, the denial of a motion for summary judgment is not a final appealable order since it does not determine the action. See Celebrezze v. Netzley (1990),51 Ohio St.3d 89, 90, 554 N.E.2d 1292, State ex rel. Overmeyer v.Walinski (1966), 8 Ohio St.2d 23, 222 N.E.2d 312. Because the trial court denied summary judgment on Thibodeaux's sexual harassment claims, there is no final appealable order concerning those claims. Thus, we have no jurisdiction to consider issues related to those claims.
 {¶ 18} With that prelude, we proceed to consider the other arguments contained in Thibodeaux's first and second assignments of error. Here, Thibodeaux contends the trial court erred in concluding, as a matter of law, that she was not constructively discharged. She argues that the court failed to consider evidence establishing that Ken Didway acted as her supervisor until Gene Smith's replacement arrived.
 {¶ 19} To establish constructive discharge, an employee must show that "the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." Mauzy v. Kelly Services,Inc. (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272, paragraph four of the syllabus. In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent.Mauzy, 75 Ohio St.3d at 589.
 {¶ 20} Viewing the evidence in a light most favorable to Thibodeaux, we conclude no reasonable trier of fact could find that B E K constructively discharged Thibodeaux. Thibodeaux testified that she quit sometime between June 9th and June 12th. The evidence indicates that B E K removed Smith and Thompson from the job site on May 27th, two weeks before Thibodeaux quit. Thibodeaux claims that she quit because B E K made Ken Didway her temporary supervisor after Smith's removal. However, there is no evidence to substantiate Thibodeaux's claim that Ken Didway was her supervisor. Carolyn Morgan and Richard Baldwin both testified that Didway was not Thibodeaux's supervisor. Mr. Baldwin testified that Smith's replacement, Bob Fitzgerald, arrived in Chillicothe immediately after Smith's removal. Nancy Fisher testified that Ken Didway was "the leader of the night [shift]." However, Thibodeaux's testimony indicates that she worked during the day.
 {¶ 21} Even if we accept Thibodeaux's claim that Didway was her supervisor, Thibodeaux's testimony establishes that Bob Fitzgerald arrived in Chillicothe three days after Smith's removal. By our calculation, this would put Bob Fitzgerald in Chillicothe by May 31st, at the latest. Yet, Thibodeaux did not quit her job until sometime between June 9th and June 12th. Thus, according to Thibodeaux's own testimony, Ken Didway ceased being her supervisor almost two weeks before she quit.
 {¶ 22} Additionally, the evidence indicates that B E K laid Didway off on June 9, 1998. Therefore, Thibodeaux's harassers were no longer working at the job site when she quit. With Smith, Thompson, and Didway gone, Thibodeaux could not reasonably believe that she would continue to be sexually harassed. In fact, there is no evidence that Ken Didway, or any other employee, sexually harassed Thibodeaux after Smith's removal, although Thibodeaux testified that some of the employees stared at her and made "hex" signs when they saw her.
 {¶ 23} Thibodeaux also claims that she quit because she believed Bob Fitzgerald was going to fire her. However, Nancy Fisher, the personnel manager, testified that she assured Thibodeaux that Fitzgerald was not going to fire her. She informed Thibodeaux that Fitzgerald just wanted to talk to her. Both Nancy Fisher and Richard Baldwin testified that Bob Fitzgerald simply intended to talk to Thibodeaux about her absenteeism. There was no reason for Thibodeaux to think that her termination was imminent once Nancy Fisher informed her that Fitzgerald did not intend to fire her.
 {¶ 24} Viewing the evidence in a light most favorable to Thibodeaux, we conclude no reasonable trier of fact could find that a reasonable person in Thibodeaux's position would have felt compelled to resign. Because Thibodeaux failed to establish a genuine issue regarding whether she was constructively discharged, the trial court properly granted summary judgment on this claim. Thus, Thibodeaux's first and second assignments of error lack merit.
 {¶ 25} In her third assignment of error, Thibodeaux contends the court erred in granting summary judgment on her claim for wrongful discharge in violation of public policy. She contends the court erred in concluding, as a matter of law, that B E K did not constructively discharge her.
 {¶ 26} Under Ohio law, an employer may discharge an at-will employee for any reason as long as the discharge does not contravene a clear public policy. Greeley v. Miami ValleyMaintenance Contrs., Inc. (1990), 49 Ohio St.3d 228,551 N.E.2d 981, paragraph two of the syllabus. See, also, Painter v.Graley (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph two of the syllabus. If an employer's discharge of an at-will employee violates public policy, that employee may bring a cause of action for wrongful discharge in violation of public policy.Painter. In Collins v. Rizkana (1995), 73 Ohio St.3d 65,652 N.E.2d 653, paragraph one of the syllabus, the Supreme Court of Ohio recognized that "a cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment/discrimination."
 {¶ 27} However, an at-will employee may maintain a cause of action for wrongful discharge in violation of public policy only if the employee was discharged or disciplined. See Greeley,49 Ohio St.3d 228, paragraph one of the syllabus; Kulch v.Structural Fibers, Inc., 78 Ohio St.3d 134, 1997-Ohio-219,677 N.E.2d 308, paragraph three of the syllabus. See, also Bell v.Cuyahoga Community College (1998), 129 Ohio App.3d 461, 465,717 N.E.2d 1189. Here, there is no evidence that B E K disciplined Thibodeaux because of the sexual harassment. Moreover, Thibodeaux has failed to establish that B E K discharged her. As noted above, no reasonable trier of fact could find that Thibodeaux was constructively discharged. Because Thibodeaux failed to establish that B E K discharged or disciplined her, she cannot maintain a cause of action for wrongful discharge in violation of public policy. Thus, the trial court properly granted summary judgment on this claim.
 {¶ 28} In her fourth assignment of error, Thibodeaux contends the court erred in granting summary judgment on her claim for intentional infliction of emotional distress. She argues that the court erred in finding that she failed to demonstrate any severe or debilitating mental anguish.
 {¶ 29} The Supreme Court of Ohio has defined the tort of intentional infliction of emotional distress as: "One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Yeager v. Local Union 20,Teamsters, Chauffeurs, Warehousemen Helpers of Am. (1983),6 Ohio St.3d 369, 453 N.E.2d 666, syllabus. To establish a claim for intentional infliction of emotional distress, the plaintiff must prove: (1) that the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress; (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it would be considered utterly intolerable in a civilized community; (3) that the defendant's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental distress suffered by plaintiff is serious and of such a nature that no reasonable person could be expected to endure it. See Pyle v. Pyle (1983),11 Ohio App.3d 31, 34, 463 N.E.2d 98. See, also, Phung v. WasteMgt., Inc., 71 Ohio St.3d 408, 410, 1994-Ohio-389,644 N.E.2d 286.
 {¶ 30} Assuming, without deciding, that Thibodeaux can establish the first three elements of her claim, we conclude that she has failed to establish a genuine issue regarding the last element, i.e., whether she suffered serious emotional distress. The Supreme Court of Ohio has made clear that "in order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious."Yeager, 6 Ohio St.3d at 374. In Paugh v. Hanks (1983),6 Ohio St.3d 72, 78, 451 N.E.2d 759, the Supreme Court of Ohio described "serious emotional distress" as "emotional injury which is both severe and debilitating." The Paugh Court held that "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."Id. The Court then set forth some examples of serious emotional distress: "A nonexhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia." Id.
 {¶ 31} In her affidavit, Thibodeaux stated that she suffered stress, humiliation, embarrassment, and loss of self-esteem. She further testified that the stress lowered her resistance causing her to become physically ill. She testified that she missed "a few days of work" because she was "so physically ill that [she] could not do [her] job." However, viewing the evidence in a light most favorable to Thibodeaux, no reasonable trier of fact could find that the emotional distress Thibodeaux suffered was severe and debilitating. Thibodeaux testified that she did not seek treatment from a psychologist or psychiatrist. Although she received medical treatment, Thibodeaux testified that she could not remember whether the doctor prescribed antidepressants. Additionally, the evidence indicates that Thibodeaux continued to work both during and after the harassment. One month after she quit, Thibodeaux accepted a job working for B E K in Alabama. After that job, she worked for B E K at a site in South Carolina. In 2001, Thibodeaux started her own business. The evidence also indicates that Thibodeaux began dating her future husband one week after she quit the job in Chillicothe. She married her husband in February 1999. We do not trivialize the emotional distress Thibodeaux suffered; however, her testimony establishes that she did not suffer emotional distress of the magnitude envisioned in Paugh, supra. Because Thibodeaux failed to establish that a genuine issue exists regarding whether she suffered serious emotional distress, the trial court properly granted summary judgment on her intentional infliction of emotional distress claim. Accordingly, Thibodeaux's fourth assignment of error lacks merit.
 {¶ 32} Finally, although Thibodeaux's notice of appeal also mentions her unlawful retaliation claim, she has failed to present any arguments relating to that claim and formally abandoned it at oral argument. Therefore, we need not consider whether granting summary judgment on this claim was appropriate. See App.R. 12(A).
 {¶ 33} Having concluded that Thibodeaux's four assignments of error lack merit, we affirm the trial court's judgment.
Judgment affirmed.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, P.J. Kline, J.: Concur in Judgment and Opinion.
[1] Gene Smith and Cliff Thompson were both salaried employees. Sheri Thibodeaux was an hourly employee.